1   PACIFIC TRIAL ATTORNEYS
    A Professional Corporation
2   Scott J. Ferrell, Bar No. 202091
    sferrell@pacifictrialattorneys.com
3   Victoria C. Knowles, Bar No. 277231
    vknowles@pacifictrialattorneys.com
4   4100 Newport Place Drive, Ste. 800
    Newport Beach, CA  92660
5   Tel: (949) 706-6464
    Fax: (949) 706-6469
6
    Attorneys for Plaintiff
7

8               UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10  JIM REIDER, individually and on behalf    Case No. 8:17-cv-00026-JLS-DFM
    of all others similarly situated,
11                                             **PLAINTIFF'S MEMORANDUM OF
                   Plaintiff,                  POINTS AND AUTHORITIES IN
12                                             OPPOSITION TO DEFENDANT
                   v.                          ELECTROLUX HOME CARE
13                                             PRODUCTS, INC.'S MOTION TO
    ELECTROLUX HOME CARE                       DISMISS PLAINTIFF'S FIRST
14  PRODUCTS, INC., a Delaware                 AMENDED CLASS ACTION
    corporation; and DOES 1 – 10, inclusive,  COMPLAINT PURSUANT TO FED.
15                                             R. CIV. P. 12(b)(6)**
                   Defendants.
16                                             [Request for Judicial Notice and Written
                                               Objections to Evidence filed concurrently
17                                             herewith]

18                                             Date:       April 14, 2017
                                               Time:       2:30 p.m.
19                                             Courtroom:  10-A
                                               Judge:      Josephine L. Staton
20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

I.   ARGUMENT ............................................................................................. 1

   A.   The UCL Claim Should Not Be Dismissed. .................................. 1

      1.   Standard for "Unfair" Prong of UCL ..................................... 1

      2.   The FAC Has Alleged an "Unfair" Practice Via an "Unethical" Practice in Violation of the DMA's Ethical Guidelines. ............................................................... 3

         a)   Defendant Conflates the Concepts of "Unethical" and "Established Public Policy" In Order to Avoid the Reality that the DMA's Ethical Guidelines Can Serve as the Predicate for an "Unethical" Practice in Violation of the "Unfair" Prong of the UCL ........................................ 5

         b)   *Byler v. Deluxe Corp.* Is Directly on Point ............... 6

         c)   *Cooks v. The Hertz Corp.* Is Directly on Point. .......... 8

      3.   The FAC Has Sufficiently Alleged an "Unfair" Practice Via an Established Public Policy. ........................ 10

         a)   California Decisions Rely Upon Violations of Public Policy Originating Beyond California as the Predicate of UCL "Unfair" Prong Claims. ........ 11

         b)   Defendant's Argument Seeks to Conflate the "Unlawful" Prong with the "Unfair" Prong. .......... 12

         c)   Defendant's Position Is Inconsistent. ...................... 13

         d)   *Elias v. Hewlett-Packard Co.* and *Rojas-Lozano v. Google, Inc.* Are Distinguishable. ............. 13

      4.   The FAC Has Sufficiently Alleged an "Unfair" Practice Via Substantial Injuries. ........................................ 15

      5.   The FAC Has Sufficiently Alleged an "Unfair" Practice Under a Balancing Test. ........................................ 15

         a)   Defendant's Argument that It Would Shut Down Its Website Operations If It Were Required to Avoid Charging a Flat $7.99 for "Standard Ground" Shipping Requires Resolving Factual Issues that Exceed the Scope

of an Appropriate Motion to Dismiss Under
Rule 12(b)(6)..................................................................16

6.   Plaintiff Is Not Barred as a Matter of Law From
Maintaining a UCL Claim Simply Based on the Mere
Disclosure of the Shipping Cost Charged............................17

7.   Defendant's Argument that Plaintiff's Injury Was
Reasonably Avoidable Seeks to Apply the FTC Test
That the Ninth Circuit Has Expressly Rejected in the
UCL "Unfair" Prong Context. ............................................20

8.   Defendant's Argument that Plaintiff Did Not Overpay
for Shipping Requires Resolving Factual Issues that
Exceed the Scope of an Appropriate Motion to
Dismiss Under Rule 12(b)(6). .............................................21

9.   Defendant's Implicit Argument that It Does Not Keep
Records that Show the Actual Cost of Delivery
Requires Resolving Factual Issues that Exceed the
Scope of an Appropriate Motion to Dismiss Under
Rule 12(b)(6). .....................................................................24

B.   The CLRA Claim Should Not Be Dismissed................................24

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anderson v. Mt. Clemens Pottery Co.*,
  328 U.S. 680, 692, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946)........................................ 14

*Byler v. Deluxe Corp.*,
  No. 3:16-cv-00493-AJB-JLB, 2016 U.S. Dist. LEXIS 111763 (S.D.
  Cal. Aug. 19, 2016)........................................................................................*passim*

*Cooks v. The Hertz Corp.*,
  No. 3:15-cv-0652-NJR-PMF, 2016 WL 3022403 (S.D. Ill. Apr. 29,
  2016) .............................................................................................................*passim*

*Davis v. HSBC Bank Nevada, N.A.*,
  691 F.3d 1152 (9th Cir. 2012) ........................................................................2, 12, 15

*Delano Farms Co. v. California Table Grape Comm'n*,
  No. 1:07-cv-1610 OWW SMS, 2010 WL 2952358 (E.D. Cal. July 26,
  2010) ................................................................................................................17, 23, 24

*Direct Marketing Ass'n v. Brohl*,
  --U.S.--, 135 S. Ct. 1124 (2015) ............................................................................. 4

*Elias v. Hewlett-Packard Co.*,
  903 F. Supp. 2d 843 (N.D. Cal. 2012) ................................................................. 6, 13

*Gillings v. Time Warner Cable LLC*,
  583 Fed. Appx. 712, 714 (9th Cir. 2014)................................................................. 14

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) ..................................................................................... 21

*Lozano v. AT&T Wireless Servs., Inc.*,
  504 F.3d 718 (9th Cir. 2007) ........................................................................3, 12, 15, 21

*McDonald v. Coldwell Banker*,
  543 F.3d 498 (9th Cir. 2008) ................................................................................... 2, 5

*Orkin Exterminating Co., Inc. v. F.T.C.*,
  849 F.2d 1354 (11th Cir. 1988) ....................................................................11, 12, 16, 21

*Rojas-Lozano v. Google, Inc.*,
  159 F. Supp. 3d 1101, 1117 (N.D. Cal. 2016).....................................................*passim*

*U.S. Security v. FTC*,
  No. CIV-03-122-W, 2003 WL 21410252 (W.D. Okla. Mar. 26, 2003).................... 4

**California Cases**

*Bank of the West v. Superior Court,*
2 Cal. 4th 1254, 1267 (1992) ................................................................. 18

*Camacho v. Automobile Club of So. Cal.,*
142 Cal. App. 4th 1394 (2006) ......................................................... 2, 3, 21

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,*
20 Cal. 4th 163 (Cal. 1999).............................................................. *passim*

*Dyna-Med, Inc. v. Fair Employment and Housing Comm'n,*
43 Cal. 3d 1379 (Cal. 1987)..................................................................... 12

*Gregory v. Albertson's, Inc.,*
104 Cal. App. 4th 845 (2002) ..................................................................... 2

*Korea Supply Co. v. Lockheed Martin Corp.,*
29 Cal. 4th 1134 (Cal. 2003)......................................................... 1, 12, 15

*Linear Technology Corp. v. Applied Materials, Inc.,*
152 Cal. App. 4th 115 (2007) .......................................................... 17, 23, 24

*McKell v. Washington Mut., Inc.,*
142 Cal. App. 4th 1457 (2006) ................................................................ 11

*Morgan v. AT & T Wireless Servs., Inc.,*
177 Cal. App. 4th 1235 (2009) .................................................................. 1

*Motors, Inc. v. Time Mirror Co.,*
102 Cal. App. 3d 735 (1980) ..................................................................... 2

*People v. Casa Blanca Convalescent Homes, Inc.,*
159 Cal. App. 3d 509 (1984) ............................................................... 2, 3, 5

*Plotkin v. Sajahtera, Inc.,*
106 Cal. App. 4th 953 (2003) ............................................................ 17, 18

*Saunders v. Superior Court,*
27 Cal. App. 4th 832 (1994) ................................................................... 12

*Searle v. Wyndham Int'l, Inc.,*
102 Cal. App. 4th 1327 (2002) ......................................................... 18, 19

*Shvarts v. Budget Group, Inc.,*
81 Cal. App. 4th 1153 (2000) ................................................................. 20

*South Bay Chevrolet v. General Motors Acceptance Corp.,*
72 Cal. App. 4th 861 (1999) ...................................................................... 3

*State Farm Fire & Casualty Co. v. Superior Court,*
    45 Cal. App. 4th 1093 (1996) ............................................................. *passim*

**Federal Statutes**

Federal Trade Commission Act ................................................................ 10, 13

Federal Trade Commission Act § 5 of the Federal Trade Commission Act,
    15 U.S.C. § 45(n) ............................................................................. *passim*

Federal Trade Commission Act § 5(a) of the Federal Trade Commission
    Act, 15 U.S.C. § 45(a) .......................................................................... 10

**California Statutes**

Cal. Civ. Code
    § 1750 *et seq.* ...................................................................................... 25
    § 1936(m)(2) ........................................................................................ 20

Cal. Bus. & Prof. Code
    § 17200 *et seq.* ............................................................................... *passim*

**Other State Statutes**

Illinois Consumer Fraud & Deceptive Business Practices Act, 815 ILCS
    505/1 *et seq.* ..................................................................................... 9, 10

Missouri Merchandising Practices Act, Mo. Rev. Stat.
    § 407.010 *et seq.* .............................................................................. 9, 10

**Federal Rules**

Fed. R. Civil Proc. Rule 12 .................................................................... 16

Fed. R. Civil Proc. Rule 12(b)(6).................................................... *passim*

Fed. R. of Evid. 401 ............................................................................... 21

Fed R. of Evid. 403 ................................................................................ 22

**Other Authorities**

*In the Matter of Bill Crouch Foreign, Inc., d/b/a Bill Crouch Imports, Inc.*
    *(Formerly Mazda of Boulder, Inc.),*
    96 F.T.C. 111, 1980 WL 339028 (July 31, 1980) ................................... 10

TABLE OF AUTHORITIES

# I.     ARGUMENT

## A.     The UCL Claim Should Not Be Dismissed.

### 1.     Standard for "Unfair" Prong of UCL

California Supreme Court case authority has consistently held that "the unfair competition law's scope is broad."[1]  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (Cal. 1999) (describing the UCL's coverage as "sweeping"); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (Cal. 2003); *State Farm Fire & Casualty Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1103 (1996) ("This standard is intentionally broad").

Although the California Supreme Court has yet to define "unfair" under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.* in the consumer context (as opposed to the business competitor context involving anticompetitive practices), *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 184, 187 & n.12 (Cal. 1999), California intermediate appellate courts have proffered their respective definitions.  *See Morgan v. AT & T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1254-55 (2009).

---

[1] The California Supreme Court has explained the rationale for such broad scope as follows:

" '[T]he Legislature ... intended by this sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur. Indeed, ... the section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable ' " "new schemes which the fertility of man's invention would contrive." ' " As the . . . court observed: 'When a scheme is evolved which on its face violates the fundamental rules of honesty and fair dealing, a court of equity is not impotent to frustrate its consummation because the scheme is an original one....' With respect to 'unlawful' or 'unfair' business practices, [former] section 3369 [today section 17200] specifically grants our courts that power. [¶] In permitting the restraining of all 'unfair' business practices, [former] section 3369 [today section 17200] undeniably establishes only a wide standard to guide courts of equity; as noted above, given the creative nature of the scheming mind, the Legislature evidently concluded that a less inclusive standard would not be adequate." '[I]t would be impossible to draft in advance detailed plans and specifications of all acts and conduct to be prohibited [citations], since unfair or fraudulent business practices may run the gamut of human ingenuity and chicanery.' "

*Cel-Tech*, 20 Cal. 4th at 181 (internal citations omitted).

One court has said that an unfair business practice is one that "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *People v. Casa Blanca Convalescent Homes, Inc.*, 159 Cal. App. 3d 509, 530 (1984); *McDonald v. Coldwell Banker*, 543 F.3d 498, 506 (9th Cir. 2008) ("An unfair business practice is one that either 'offends an established public policy' or is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'") (citing *Casa Blanca*); *Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1117 (N.D. Cal. 2016) ("A business practice is unfair within the meaning of the UCL if it violates established public policy *or* if it is immoral, unethical, oppressive or unscrupulous . . . .") (emphasis in original).

Another court has held that deciding whether a practice is unfair "involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer.  In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim[.]" *Motors, Inc. v. Time Mirror Co.*, 102 Cal. App. 3d 735, 740 (1980); *State Farm*, 45 Cal. App. 4th at 1103-04; *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012).

Another court has applied *Cel-Tech*'s definition of "unfair" to consumer actions insofar as the "unfair" claim is predicated on public policy. [2] *Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 854 (2002) ("we read *Cel-Tech* to require that the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions").

---

[2] Given that courts have characterized *Cel-Tech* as potentially signaling a "narrower interpretation," *Gregory*, 104 Cal. App. 4th at 854, which is inconsistent with Supreme Court authority, including *Cel-Tech* itself, Plaintiff Jim Reider's ("Plaintiff") position is that *Gregory*'s definition of "unfair" should ***not*** be applied here.  *See Camacho v. Automobile Club of So. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006) ("[I]n the context of consumer cases, 'tethering' to positive law undercuts the ability of the courts to deal with new situations, and new abuses.").

Finally, another court has applied a definition based upon section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(n). *Camacho v. Automobile Club of So. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006) ("Since 1980, the factors that define unfairness under section 5 are: (1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided.").[3] However, the Ninth Circuit has expressly rejected the FTC test. *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007) ("[W]e decline to apply the FTC standard in the absence of a clear holding from the California Supreme Court.").

Although Defendant Electrolux Home Care Products, Inc. ("Defendant") relies upon the "balancing test" set forth in *South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal. App. 4th 861 (1999), (Mtn. Dism. at 4:18-20), a careful review of *South Bay Chevrolet* reveals that the Court of Appeal therein cited not only the "balancing test" of *State Farm*, 72 Cal. App. 4th at 886, it also cited the test in *Casa Blanca*, 72 Cal. App. 4th at 886-87. As recognized by the Ninth Circuit, the various tests "are not mutually exclusive." *Lozano*, 504 F.3d at 736 ("adopting one standard does not necessitate rejection of the other"). Thus, regardless of whether this Court applies the "balancing test" of *State Farm* or the test in *Casa Blanca*, Plaintiff submits that the First Amended Complaint's ("FAC") allegations meet such definitions of "unfair" such that this Court need not decide which definition to apply here.

**2.   The FAC Has Alleged an "Unfair" Practice Via an "Unethical" Practice in Violation of the DMA's Ethical Guidelines.**

Regardless of whether this Court applies the "balancing test" of *State Farm* or the test cited in *Casa Blanca*, the FAC has sufficiently alleged an "unfair" practice that

---

[3] Significantly, *Camacho* expressly clarified that the third factor should be interpreted to avoid significantly reducing its effectiveness. That is, "consumers cannot have reasonably avoided the injury if they could not have reasonably anticipated the injury, if they did not have the means to avoid the injury, or if their free market decisions were unjustifiably hampered by the conduct of the seller." 142 Cal. App. 4th at 1405.

violates the Direct Marketing Association's ("DMA") Ethical Guidelines, which are industry standard.[4]  (*See* FAC ¶¶ 9-35, 42, 46-47, 55-56 & Exs. 1-5.)

Paragraph 16 of the FAC, quoting both the 2014 version and the 2011 version, alleges: "These Ethical Guidelines "are intended to provide individuals and organizations involved in direct marketing in all media with generally accepted principles of conduct."  *Id.* at 2.  They "reflect DMA's long-standing policy of high levels of ethics and the responsibility of the Association, its members, and all marketers to maintain consumer and community relationships that are based on fair and ethical principles."  *Id.*"  (FAC ¶ 16.)  Paragraph 20 of the FAC alleges:  "In both the 2014 and 2011 editions of the DMA Ethical Guidelines, Article[]#11 states:  Postage, shipping or handling charges, if any, should bear a reasonable relationship to actual costs incurred."  (FAC ¶ 20.)  Paragraph 21 of the FAC alleges:  "With respect to Article #11 DMA's companion volume *Do the Right Thing* states:  "When figuring shipping and handling fees, it is important to reflect the costs as accurately as possible so that your customers or prospects are not likely to review these fees as a company 'profit center.'"  (FAC ¶ 21.)  In referencing the DMA's press release providing guidance in 2003, which is attached to the FAC as Exhibit "4," paragraph 23 of the FAC alleges:  "This guidance stated, "Companies should determine what costs will be covered, and substantiate their method …. Ideally, a fulfillment cost study should be done with the assistance of an impartial outside expert."  *Id.*  (FAC ¶ 23.)  Paragraph 25 of the FAC alleges:  "Plaintiff is informed and believes, and thereupon alleges, that Defendant did not obtain a fulfillment cost study with the assistance of an impartial outside expert prior to charging Plaintiff a fee for "Shipping/Handling.""  (FAC ¶ 25.)  Paragraph 26 of the FAC alleges:  "The current version of DMA's ethical guidance on shipping charges is displayed on its

---

[4] "Direct Marketing Association is a trade association of businesses and organizations that market products directly to consumers, . . . , via catalogs, print advertisements, broadcast media, and the Internet."  *Direct Marketing Ass'n v. Brohl*, --U.S.--, 135 S. Ct. 1124 (2015).   "It represents approximately 5000 member companies from the United States."  *U.S. Security v. FTC*, No. CIV-03-122-W, 2003 WL 21410252, at *1 (W.D. Okla. Mar. 26, 2003).

web page entitled, "Guidance for Establishing and Substantiating Shipping and Handling Charges," . . . , where it states: "Some marketers take the position that so long as there is clear disclosure on how much the consumer pays in total for the shipped product, the amount the marketer charges for shipping and handling should not matter. There appears to be a trend by law enforcement agencies, however, to insist that a consumer who is charged shipping and handling costs should be paying a fee reasonably based on the marketer's cost. The latter position is consistent with existing DMA guidelines. …. Your goal should be not to charge consumers as a whole more than you pay in total." (FAC ¶ 26.)

> a)   **Defendant Conflates the Concepts of "Unethical" and "Established Public Policy" In Order to Avoid the Reality that the DMA's Ethical Guidelines Can Serve as the Predicate for an "Unethical" Practice in Violation of the "Unfair" Prong of the UCL.**

Notwithstanding the fact that the FAC alleges that the DMA's Ethical Guidelines "are intended to provide individuals and organizations involved in direct marketing in all media with generally accepted principles of conduct," (FAC ¶ 16), Defendant argues that "reliance on a private association's policy does not suffice" to allege the violation of a **California public policy** in order to support a UCL claim under the "unfair" prong. (Mtn. Dism. at 7:9-12.) In other words, Defendant fails to argue that the DMA's Ethical Guidelines cannot serve as the basis for asserting an "unethical" practice of Defendant.

Defendant's analysis is wrong because it seeks to conflate the terms of "unethical" and "established public policy" set forth in *Casa Blanca* and its progeny. *Casa Blanca*, 159 Cal. App. 3d at 530; *McDonald*, 543 F.3d at 506. Indeed, in *Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101 (N.D. Cal. 2016), which Defendant relies upon expressly, (Mtn. Dism. at 7:12-14), the district court made it crystal clear that "established public policy" and "unethical" practice are stated in the disjunctive. *Rojas-Lozano*, 159 F. Supp. 3d at 1117 ("A business practice is unfair within the

1   meaning of the UCL if it violates established public policy *or* if it is immoral, unethical,

2   oppressive or unscrupulous . . . .") (emphasis in original).

3        The apparent reason for such obfuscation is because Defendant has been unable to

4   cite *any* case authority indicating that the DMA's Ethical Guidelines cannot serve as the

5   predicate for Plaintiff's position that Defendant's shipping cost policy is "unethical" in

6   violation of the "unfair" prong of the UCL.

7        Although Defendant relies upon *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d

8   843 (N.D. Cal. 2012), in support of its position that Plaintiff has not adequately alleged

9   the unfair prong of the UCL, (Mtn. Dism. at 7:14-17), that decision is distinguishable.

10       In *Elias*, the plaintiff made conclusory statements regarding the defendant's

11  alleged conduct being unfair without referencing any established public policy that the

12  defendant's actions violated "or claim that the conduct is immoral, **_unethical_**,

13  oppressive, or unscrupulous." *Elias*, 903 F. Supp. 2d at 858 (emphasis added).  Here, in

14  contrast, the FAC repeatedly alleges that Defendant's conduct is unethical.[5]  (*See, e.g.*,

15  FAC ¶¶ 9, 12-14, 19, 31, 33, 42, 46, 47, 55; *id.* at 14:27.)

16            **b)**   ***Byler v. Deluxe Corp.* Is Directly on Point**

17       Defendant ignores a recent federal district court decision in *Byler v. Deluxe Corp.*,

18  No. 3:16-cv-00493-AJB-JLB, 2016 U.S. Dist. LEXIS 111763 (S.D. Cal. Aug. 19, 2016),

19  which supports Plaintiff's position.  In *Byler*, the plaintiffs, four individuals, alleged that

20  the defendant in that case, Deluxe Corporation, which allegedly sold checks to account

21  holders at various banks, *id.* at *2, charged the plaintiffs "excessive, deceptive, unfair,

---

22

23  [5] *Elias* is distinguishable for other reasons.  The plaintiff in *Elias* made "conclusory
    statements" regarding the defendant's alleged conduct being unfair without

24  "referenc[ing] any established public policy."  903 F. Supp. 2d at 858.  Here, in
    contrast, Plaintiff relies upon the FTC's consent order and the DMA's Ethical

25  Guidelines.  (FAC ¶¶ 9, 12-14, 19, 31, 33, 42, 46-47, 55.)  In addition, unlike in *Elias*
    whereby the plaintiff failed to allege any basis for concluding that the alleged injury to

26  the general public and the loss of money and property "outweighs the reasons,
    justifications and motives of Defendants," *id.* at 858, the FAC alleges a strong basis for

27  concluding that the alleged tangible economic injury to Plaintiff and the putative class
    outweighs the reasons, justifications and motives of Defendant, which is limited to the

28  enhancement of Defendant's profits.  (FAC ¶¶ 12, 27, 33-35.)

1    and unethical fees for the delivery of new and replacement checks by Defendant." *Id.* at

2    \*3.  The Plaintiffs' "main contention is that the shipping and delivery charges are not

3    reasonably related to the costs Defendant incurred in delivering or shipping the checks

4    to consumers." *Id.* at \*3.  The Plaintiffs alleged that "the charges assessed on Deluxe's

5    website do not represent the actual charges incurred in shipping and handling." *Id.* at

6    \*3-\*4.  The plaintiffs sued Deluxe Corporation for, *inter alia*, violation of the "unfair"

7    prong of the UCL and violation of the CLRA.  *Id.* at \*3.  Deluxe Corporation moved to

8    dismiss the plaintiffs' first amended class action complaint pursuant to Rule 12(b)(6) on

9    the grounds that the plaintiffs failed to state a claim under the UCL and CLRA.  2016

10   U.S. Dist. LEXIS 111763, at \*22.

11          The district court in *Byler* denied Deluxe Corporation's motion to dismiss under

12   Rule 12(b)(6) based on the following reasoning:

13                 As an initial matter, Defendant has conflated the meanings of unlawful and

14          unfair conduct within the context of a UCL violation.  Plaintiffs need not cite to a

15          particular law that was violated in asserting that Defendant engaged in unfair

16          conduct.  Plaintiffs have alleged that Defendant engaged in unfair conduct by

17          charging excessive fees associated with shipping checks to Plaintiffs.  ***Plaintiffs***

18          ***also refer to the Direct Marketing Association ("DMA") Guidelines, which***

19          ***provide guidance on best practices associated with shipping and assignment of***

20          ***related costs.***  (*See* Doc. No. 19 ¶¶ 35–49); (*see id.* ¶ 27) (alleging the "prices of

21          the[] delivery methods bears no reasonable relationship to, and in fact, great

22          exceed Defendant's costs incurred for delivery" and "therefore, contain improper

23          and unethical profits for Defendant."); (*Id.* ¶ 111) ("Defendant breached [its] duty

24          by engaging in acts that violate established public policy as recognized by the

25          FTC and by DMA.").

26                 At this stage in the proceedings, where the allegations in a plaintiff's

27          complaint are taken as true, Plaintiffs have sufficiently alleged unlawful and

28          unfair conduct."

1  *Byler*, 2016 U.S. Dist. LEXIS 111763, at \*24-\*25 (citation omitted) (emphasis added).

2  Thus, the district court in *Byler* expressly cited the fact that the plaintiffs in that case

3  were relying upon the DMA's Ethical Guidelines in support of their claim that Deluxe

4  Corporation had violated the unfair prong of the UCL.

5      *Byler* is directly on point here.  As was the case in *Byler*, Plaintiff in the instant

6  action is relying upon the DMA's Ethical Guidelines as the basis for alleging that

7  Defendant's practice of charging consumers of its shipped products more than the actual

8  costs of shipping is both unethical and in violation of public policy.

9              **c)    *Cooks v. The Hertz Corp.* Is Directly on Point.**

10      Defendant also ignores *Cooks v. The Hertz Corp.*, No. 3:15-cv-0652-NJR-PMF,

11  2016 WL 3022403, at \*6-\*9 (S.D. Ill. Apr. 29, 2016), which supports Plaintiff's

12  position.  In that case, four individual plaintiffs filed a putative class action against The

13  Hertz Corporation ("Hertz"), the well-known rental car agency, alleging, *inter alia*, that

14  Hertz had engaged in unfair/unethical acts by imposing two types of fees, an "Energy

15  Surcharge" and a "Vehicle License Fee Recovery" ("VLFR") (in Illinois)/"Vehicle

16  Licensing Cost Recovery" ("VLCRF") (in Missouri) in both Illinois and Missouri,

17  which fees were unrelated to costs incurred by Hertz, greatly exceeded them, and were

18  designed to provide Hertz with increased profit as opposed to cost reimbursement.  *Id.* at

19  \*2.  The plaintiffs alleged that the Energy Surcharge (the stated purpose was to offset the

20  increasing costs of utilities, bus fuel, oil and grease, etc. needed to support Hertz's

21  business operations) originated on a date when energy prices were falling.  *Id.*  The

22  plaintiffs alleged that the "charge was originated to garner more profit and not the stated

23  purpose."  *Id.*  Similarly, the plaintiffs alleged that the stated purpose of the

24  VLFR/VLCRF fee was to recover "the proportionate amount of the vehicle registration,

25  licensing, and related fees applicable to the rental."  *Id.*  The plaintiffs alleged that the

26  VLCR and VLCRF were also designed for profit and not for the stated reason, and that

27  such fees "greatly surpass any costs that Hertz incurs to license its vehicles."  *Id.*

28

The plaintiffs sued Hertz for, *inter alia*, violation of the Illinois Consumer Fraud & Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.* regarding unfair/unethical practices and the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010 *et seq.* regarding unfair/unethical practices. *Id.* at *1, *3. In particular, the district court noted that the "[p]laintiffs . . . claim that these charges are unethical and unfair because they violate the American Marketing Association and ***Direct Marketing Association's ethical standards***, in addition to violating public policy." *Id.* at *3 (emphasis added).

Hertz filed a motion to dismiss pursuant to Rule 12(b)(6) and argued that the two charges are not unfair as a matter of law. *Id.* at *2, *6. "In support, Hertz cites to various Illinois and Missouri cases to argue that because the fees were fully disclosed, its actions are not unfair as a matter of law, and a customer's belief that the fee is too high or does not accurately represent the true costs to the defendant who is providing a product or service is unpersuasive I the finding of unfair practices." *Id.* at *7.

The district court disagreed. The district court held that the "full disclosure" case law cited by Hertz was distinguishable because the allegations satisfied the ICFA's test for unfair practices. *Id.* at *7. Notably, in addressing the second factor of the ICFA, *i.e.*, whether the practice is "immoral, unethical, oppressive, or unscrupulous," *id.* at *7, *8, the district court held, "Plaintiffs' claim that Hertz charged them a fee for the purpose of gaining more profit as opposed to the stated purpose is enough for this Court to find that relief is more than theoretical." *Id.* at *8.

As for the third factor of the ICFA, *i.e.*, whether it causes substantial injury to consumers, the district court held that "when all of Plaintiffs' harms are taken together, they sufficiently allege the possibility of substantial loss." *Id.* at *8.

The district court then analyzed the MMPA claim and based on the MMPA's definition of an unfair practice, which included an "unethical" practice, *id.* at *8, the district court held, "Charging customers a fee which is misrepresented could be considered unethical conduct causing substantial injury by failing to 'preserve

1  fundamental honesty [and] fair play.'  Thus, the Court finds the charging of these fees

2  could amount to an unfair practice.  Accordingly, Hertz's motion to dismiss for failure

3  to state a claim is denied."  *Id.* at *9 (internal citation omitted).  Thus, the district court

4  relied upon the alleged violation of the DMA's ethical standards, separate and apart

5  from the alleged violation of public policy, in holding that the plaintiffs' ICFA and

6  MMPA claims premised upon "unfair" practices stated a plausible claim for relief.

7  Given the similarity of statutes, this Court can and should rely upon such holding here.

### 3.  The FAC Has Sufficiently Alleged an "Unfair" Practice Via an Established Public Policy.

10  The FAC alleges that Defendant's conduct in charging Plaintiff $7.99 for shipping

11  even though such amount is less than Defendant's actual shipping cost offends an

12  established public policy.  (FAC ¶¶ 13, 28, 46, 47, 56.)  Indeed, the FAC alleges that the

13  DMA's current guidance attached as Exhibit 5 to the FAC states:

14  "There appears to be a trend by law enforcement agencies, however, to insist that

15  a consumer who is charged shipping and handling costs should be paying a fee

16  reasonably based on the marketer's cost."

17  (FAC ¶ 26 & Ex. 5; *see also* FAC ¶ 47.)  Furthermore, the FAC includes paragraph 47.[6]

18  Thus, Plaintiff's established public policy allegations are expressly premised, in part,

19  upon the FTC's Consent Order in *In the Matter of Bill Crouch Foreign, Inc., d/b/a Bill*

20  *Crouch Imports, Inc. (Formerly Mazda of Boulder, Inc.)*, 96 F.T.C. 111, 1980 WL

21  339028 (July 31, 1980), which enforced Section 5(a) of the Federal Trade Commission

---

[6] Paragraph 47 of the FAC alleges in relevant part:

"Defendant's conduct . . . also violates public policy as recognized by the Federal Trade Commission in enforcing Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a).  In *In the Matter of Bill Crouch Foreign, Inc., d/b/a Bill Crouch Imports, Inc. (Formerly Mazda of Boulder, Inc.)*, 96 F.T.C. 111, 1980 WL 339028, the FTC entered into a consent order that prohibited a car dealer from violating the FTC Act by charging an amount for "Freight" that "exceeded respondent's actual outlays to third parties for the transportation of new automobiles."  *Id.* at *2.  By bringing that proceeding under Section 5(a) and entering into a consent order, the FTC showed that its interpretation of Section 5(a) is that such charges violate the Act."

(FAC ¶ 47.)

1  Act, 15 U.S.C. § 45(a). (FAC ¶ 47.) Thus, the FTC's Consent Order provides a separate
2  and distinct basis for Plaintiff's assertion of the violation of an established public policy.

        **a)**      **California Decisions Rely Upon Violations of Public Policy**
3
4                      **Originating Beyond California as the Predicate of UCL**
5                      **"Unfair" Prong Claims.**

6         Although Defendant contends that the DMA's Ethical Guidelines are not helpful
7  to Plaintiff's position because such Guidelines do not reflect a "California public
8  policy," (Mtn. Dism. at 7:10-12), and similarly argues in conclusory fashion that such
9  Consent Order is "inapposite," (Mtn. Dism. at 7 n.4), based on the sole argument that
10 such Consent Order reflects *Federal* public policy, as opposed to *California* policy,"
11 *id.*, ***without citing any case authority***, Defendant ignores the existing California case
12 authority reflecting that established public policy can be borrowed from non-California
13 sources including federal public policy.

14        For example, in *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457 (2006),
15 the California Court of Appeal found the existence of an unfair business practice based
16 upon violation of "**federal** public policy of expanding opportunities for home ownership
17 by reducing the cost of borrowing, in part through the use of automated underwriting
18 software." *Id.* at 1473 (emphasis added). Significantly, the Court of Appeal did not
19 mention *any* California statute setting forth such policy. Thus, under Defendant's
20 reasoning, the *McKell* decision should not exist because it relied on the violation of a
21 non-California public policy as the basis for finding that a UCL claim alleging
22 unfairness had been properly pled.

23        Similarly, in *State Farm Fire & Casualty Co. v. Superior Court*, 45 Cal. App. 4th
24 1093, 1104 (1996), the California Court of Appeal, in addressing the "unfair" prong,
25 identified "[e]xamples of unfair business practices includ[ing]: . . . systematically
26 breaching a form contract affecting many consumers." *Id.* at 1104. Significantly, the
27 Court of Appeal did not cite a California state court decision, but rather cited a federal
28 circuit court decision, *Orkin Exterminating Co., Inc. v. F.T.C.*, 849 F.2d 1354, 1367–68

(11th Cir. 1988), which was not purporting to address California public policy at all. *State Farm*, 45 Cal. App. 4th at 1104.   Rather, the Eleventh Circuit's "unfairness" analysis was limited to the enforcement of section 5 of the Federal Trade Commission Act.  *Orkin*, 849 F.2d at 1355, 1363-66.

Indeed, given that the "unlawful" prong of the UCL is not limited to borrowing just California state law, but rather includes "any practices forbidden by law, be it civil or criminal, **_federal_**, state, or **_municipal_**, statutory, regulatory, or court-made,'" *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994) (emphasis added), it makes no sense to restrict the equally broad "unfair" prong to a "California public policy" as claimed by Defendant.   "The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." *Dyna-Med, Inc. v. Fair Employment and Housing Comm'n*, 43 Cal. 3d 1379, 1387 (Cal. 1987).

> **b)    Defendant's Argument Seeks to Conflate the "Unlawful" Prong with the "Unfair" Prong.**

By insisting that only a "California public policy" (presumably declared only by the California Legislature) can support a UCL claim alleging the violation of the "unfair" prong, Defendant is implicitly arguing that only a violation of California law can support such a claim.   But, that is not so.   In essence, Defendant has improperly conflated the "unfair" prong of the UCL with the "unlawful" prong, which is separate and distinct.   "Because the statute is written in the disjunctive, it is violated where a defendant's act or practice violates any of the foregoing prongs." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) (citing *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007)).   It is well-established that under section 17200, " 'a practice may be deemed unfair even if not specifically proscribed by some other law.' " *Korea Supply Co.*, 29 Cal. 4th at 1143 (quoting *Cel-Tech*, 20 Cal. 4th at

1    180).  "In other words, a practice is prohibited as 'unfair' . . . even if not 'unlawful' and

2    vice versa."  *Cel-Tech*, 20 Cal. 4th at 180.

3                    **c)       Defendant's Position Is Inconsistent.**

4          Although Defendant contends that the FTC's Consent Order is "inapposite,"

5    (Mtn. Dism. at 7 n.4), based on the sole argument that such Consent Order reflects

6    "*Federal* public policy, as opposed to *California* policy," *id.*, Defendant conveniently

7    ignores that it has freely argued that courts interpreting the UCL "routinely look to the

8    [FTC's] interpretation of Section 5 of the [FTC Act] as persuasive authority in

9    construing the breadth of protection afforded under the UCL."  (Mtn. Dism. at 5 n.1.)

10   Simply put, Defendant can't have it both ways.

11                   **d)       *Elias v. Hewlett-Packard Co.* and *Rojas-Lozano v. Google,***

12                             ***Inc.* Are Distinguishable.**

13         As mentioned above, Defendant's reliance upon *Elias v. Hewlett-Packard Co.*,

14   *supra*, is misplaced because that decision is distinguishable.  The plaintiff in *Elias* made

15   "conclusory statements" regarding the defendant's alleged conduct being unfair without

16   "referenc[ing] any established public policy."  903 F. Supp. 2d at 858.  Here, in contrast,

17   Plaintiff relies upon the FTC's consent order and the DMA's Ethical Guidelines.  (FAC

18   ¶¶ 9, 12-14, 19, 31, 33, 42, 46-47, 55.)

19         Defendant's reliance upon *Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101

20   (N.D. Cal. 2016), is equally misplaced because that decision merely cited and referenced

21   the *Elias* decision insofar as the latter decision merely held "in part" that the plaintiff

22   therein failed to state a claim under the "unfair" prong of the UCL by not referencing

23   any established public policy that the defendant's actions violated.  *Id.* at 1118.

24         In *Rojas-Lozano*, the plaintiff sued under the UCL and CLRA alleging that

25   Google "does not tell users that it profits from the reCAPTCHA[7] prompt transcriptions,

26   ─────────────
     7 reCAPTCHA is Google's version of a Completely Automated Public Turing test to
27   tell Computers and Humans Apart ("CAPTCHA").  *Rojas-Lozano*, 159 F. Supp. 3d at
     1106-07.  "As the name suggests, CAPTCHAs are website security features that seek to
28   distinguish humans visiting a website from automated programs."  *Id.* at 1107.
     Continued on the next page

                                          - 13 -

and that by misrepresenting or omitting that fact, Google extracts free labor from users." *Id.* at 1107-08. The district court repeatedly emphasized how little time it took, *i.e.*, a few seconds, for a plaintiff to type a word in order to receive a free gmail email account. *Rojas-Lozano*, 159 F. Supp. 3d at 1113 (finding the lack of facts sufficient to plausibly support the materiality of the omitted information that the second reCAPTCHA word is used for transcription services from which Google profits rather than for security purposes because the operative complaint failed to allege that the omitted information would have been important to the plaintiff's decision to "spend a few seconds typing a word in order to receive a free email account"); *id.* at 1115 ("Plaintiff has not alleged any facts that plausibly suggest the few seconds it takes to type a second word is something for which a reasonable consumer would expect to receive compensation"); *id.* at 1118 ("Plaintiff failed to identify any statute assigning value to the few seconds it takes to transcribe one word."); *id.* at 1118 ("Plaintiff has failed to allege how these numerous benefits outweigh the few seconds it takes to transcribe one word"). The district court then cited case authority indicating that a few seconds of work is a "trifle" that may be disregarded. *Rojas-Lozano*, 159 F. Supp. 3d at 1115 (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946) ("When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified. . .") and *Gillings v. Time Warner Cable LLC*, 583 Fed. Appx. 712, 714 (9th Cir. 2014)) (federal *de minimis* wage and hour doctrine applies under California law)).

Continued from the previous page
"CAPTCHAs make this distinction by presenting a website visitor with the distorted image of letters, numbers, or words that the user must then correctly transcribe into a box before proceeding to the website." *Id.* "Humans are usually able to view the distorted images and recognize their contents: automated programs cannot." *Id.*

"While most CAPTCHA programs present only one word or phrase, reCAPTCHA sometimes requires users to transcribe two words." *Id.* at 1107. "The first word in those prompts is known to Google and serves a security purpose." *Id.* "The second word or phrase is one that Google's OCR technology failed to recognize and serves no security purpose." *Id.* "The unknown word is presented to users multiple times until the responses all point to one transcription." *Id.* "Then, Google updates its transcription of the source." *Id.*

In other words, the district court in *Rojas-Lozano* essentially found the equivalent of a "safe harbor" based on case authority recognizing that a few seconds of work can be disregarded as not compensable, which undermined the plaintiff's claim premised on the "unfair" prong of the UCL.  The district court was, in effect, stating that the plaintiff had cited nothing to rebut the case authority regarding *de minimis* wage and hour doctrine, which it had previously cited in its decision.  That is a far cry from the current circumstances at issue, whereby Plaintiff has cited the DMA's Ethical Guidelines and the FTC's consent order and no safe harbor.  *Cel-Tech*, 20 Cal. 4th at 182 ("When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor.").

Moreover, to the extent that Defendant is relying upon *Rojas-Lozano* for its statement that the plaintiff therein "fails to cite to any specific law indicating that California in fact has such a broad policy [that people should be paid for work they perform under all circumstances]," 159 F. Supp. 3d at 1118, as mentioned above, Defendant has improperly conflated the "unfair" prong of the UCL with the "unlawful" prong.  *Davis*, 691 F.3d at 1168 (citing *Lozano*, 504 F.3d at 731).  As mentioned above, the UCL's scope is "broad."  *Cel-Tech*, 20 Cal. 4th at 180; *Korea Supply Co.*, 29 Cal. 4th at 1144.  Defendant's position that Plaintiff must reference a "specific law" in order to plead a UCL violation based on the "unfair" prong is wrong.

### 4. The FAC Has Sufficiently Alleged an "Unfair" Practice Via Substantial Injuries.

The FAC, which alleges tangible, economic harm, alleges a strong basis for concluding that Defendant's actions were substantially injurious to Plaintiff and to putative class members.  *See Cooks v. The Hertz Corp.*, No. 3:15-cv-0652-NJR-PMF, 2016 WL 3022403, at *8 (S.D. Ill. Apr. 29, 2016) (holding that "when all of Plaintiffs' harms are taken together, they sufficiently allege the possibility of substantial loss").

### 5. The FAC Has Sufficiently Alleged an "Unfair" Practice Under a Balancing Test.

Assuming *arguendo* that a balancing test is applicable, the FAC has sufficiently alleged facts showing that under a balancing test, the harm to consumers like Plaintiff from paying a portion of shipping fees that represent profit for Defendant outweighs the reasons, justifications, and motives of Defendant.   Although the tangible, economic harm to Plaintiff and the putative class is substantial as pled in the FAC, the sole reason alleged in the FAC for Defendant's practice is to increase Defendant's profits.  (FAC ¶¶ 12, 27, 33-35.)  The FAC does not allege any benefit either to Plaintiff or to competition resulting from Defendant's conduct.  The FAC does not allege that Plaintiff received an increase in the level of service provided by Defendant's shipping or an enhancement of its quality.  *Orkin*, 849 F.2d at 1365.  Given that there is nothing in the four corners of the FAC from which this Court can infer that Defendant's motivation for its shipping cost policy was other than to improve its financial condition, the alleged tangible, economic injury to Plaintiff and the putative class via the loss of money outweighs the reasons, justifications, and motives of Defendant including its profit motive.

> **a)**     **Defendant's Argument that It Would Shut Down Its Website Operations If It Were Required to Avoid Charging a Flat $7.99 for "Standard Ground" Shipping Requires Resolving Factual Issues that Exceed the Scope of an Appropriate Motion to Dismiss Under Rule 12(b)(6).**

As for Defendant's argument that the "utility" of Defendant's conduct is "the convenience of shopping for products on the internet," (Mtn. Dism. at 8:27-9:1), such cryptic argument is an unadorned factual assertion without any evidentiary support that is inappropriate for the Court to consider in the context of a motion to dismiss under Rule 12)(b)(6).  What exactly does Defendant mean?  Is Defendant asserting that if it was required to not be able to charge standard amounts for shipping (besides the current limited shipping options that it offers to its customers), then it would cease engaging in any and all online transactions permanently?  Has this been the subject of board of director meetings or meetings of Defendant's executive team reflected in the corporate

minutes prior to the commencement of this action?   If so, did Defendant obtain a fulfillment cost study with the assistance of an impartial outside expert?

What the foregoing amply illustrates is that Defendant's "utility" argument, which apparently relies upon the unsubstantiated factual argument that Defendant would cease all website merchandising if it were required to avoid charging a standard amount of $7.99 for "Standard Ground" shipping is inappropriate for resolution via the instant Motion to Dismiss under Rule 12(b)(6).   *See Linear Technology Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 134–35 (2007) ("Whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires 'consideration and weighing of evidence from both sides' and which usually cannot be made on demurrer."), *cited in Byler*, 2016 U.S. Dist. LEXIS 111763, at *26; *see also Delano Farms Co. v. California Table Grape Comm'n*, No. 1:07-cv-1610 OWW SMS, 2010 WL 2952358, at *29 (E.D. Cal. July 26, 2010) (holding that the defendant's dispute regarding whether its alleged scheme is "unfair" "is not a determination that can be made on a motion to dismiss").

### 6.   Plaintiff Is Not Barred as a Matter of Law From Maintaining a UCL Claim Simply Based on the Mere Disclosure of the Shipping Cost Charged.

Defendant contends that Plaintiff is barred as a matter of law from maintaining a UCL claim premised upon the violation of the "unfair" prong simply based on the disclosure of the shipping cost charged with no explanation that it includes Defendant's profit.   (Mtn. Dism. at 5:21-22.)   Not so.   Defendant's reliance upon *Plotkin v. Sajahtera, Inc.*, 106 Cal. App. 4th 953 (2003), is misplaced.   In *Plotkin*, the plaintiff alleged that it was a fraudulent and deceptive practice for a hotel to charge for valet parking because the hotel failed to give members of the public notice of the valet parking charge.   *Id.* at 957.   The evidence in the record, however, revealed that users of the valet parking service did receive a notice that there was a charge to use the valet parking services and what the precise charge was via the parking ticket provided to

users.  *Id.* at 959.  *Plotkin* is distinguishable for multiple reasons.  First, the plaintiff in that case asserted the "fraudulent" prong of the UCL, which is why the Court of Appeal analyzed such claim under the "likely to be deceived" test.  *Id.* at 965 (citing *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992)).  Thus, the Court of Appeal had no opportunity to apply the test for the "unfair" prong of the UCL.  Second, *Plotkin* was issued following multiple motions for summary judgment/summary adjudication.  106 Cal. App. 4th at 959, 966.  Third, the Court of Appeal noted that some of the factual basis for the plaintiff's position "is not supported by any evidence in the record."  *Id.* at 965.  Fourth, the Court of Appeal held that "common sense dictates it would be unreasonable for someone availing himself of valet parking at a hotel in the Los Angeles metropolitan area, much less Beverly Hills, not to expect to pay for valet parking.  The ticket provides reasonable and advance notice of the charge."  *Id.* at 966.  Thus, the plaintiff's allegations of deceptive conduct contradicted common sense.  Here, in contrast, it is not "common sense" that a website merchant like Defendant would convert "shipping" costs into a hidden profit center.  *Plotkin* lends no support.

*Searle v. Wyndham Int'l, Inc.*, 102 Cal. App. 4th 1327 (2002), is equally distinguishable.  In that case, a hotel patron sued a hotel alleging that the hotel's practice of not expressly advising patrons that the 17 percent service charge that it added to its room service bills were paid to its server in violation of the UCL.  *Id.* at 1330-31.  The plaintiff raised both the "fraudulent" prong of the UCL and the "unfair" prong.  *Id.* at 1330-31.  The factual basis for the "unfair" prong claim was that the service charge "compels guests to pay a gratuity, which [the plaintiff] believes should be entirely voluntary."  *Id.*  The Court of Appeal affirmed the trial court's sustaining of a demurrer without leave to amend.  *Id.* at 1331.  Significantly, the Court of Appeal rejected the fundamental premise of the plaintiff's argument, which was that the mandatory service charge paid entirely to the server must be treated as a "gratuity."  *Id.* at 1334-35; *id.* at 1335 ("Because the service charge is mandatory and because the hotel is free to do with the charge [] as it pleases, the service charge is simply not a gratuity which is subject to

the discretion of the individual patron."). Significantly, the Court of Appeal, analogizing to other methods by which a hotel generates revenue from its guests, noted that, "The mini-bar patron, *__like the room service patron__*, is given both *__clear notice the service being offered comes at a hefty premium__* and the freedom to decline the service." *Id.* at 1334 (emphasis added). The Court of Appeal added, "Just as the hotel patron has no legitimate interest in what the hotel does with the large premium it earns from its mini-bar snacks, the patron has no legitimate interest in what the hotel does with the service charge." *Id.* ("What a hotel does with the revenue it earns—from either the mini-bar, in-room movies or its room service charges--is of no direct concern to hotel guests."). The Court of Appeal then held that "the hotel's decision to compensate its room service servers by way of the 17 percent service charge in no material way interferes with the patron's reasonable expectations with respect to the custom of tipping." *Id.* at 1335. "[T]ipping is solely a matter between patron and server. While some patrons will care about what the server receives from his employer, others will not. The curiosity of those who, like Groucho [Marx], want to know how much the server has in his pocket is just that: curiosity. It is a curiosity about something, i.e., the server's financial condition, in which the tipper has no legitimate interest." *Id.*

Unlike the circumstances in *Searle*, the FAC alleges the absence of any clear notice that the shipping cost offered by Defendant comes at a hefty premium or any premium at all. (FAC ¶ 35) (referencing Defendant's "profit that it has earned from *__hidden__* shipping and handling charges") (emphasis added). Thus, *Searle* is akin to comparing apples and oranges. Although Defendant seeks to analogize between the hotel patron ordering room service who may be "curious" about what his or her server receives from his employer and the instant action, the analogy is inapt because Defendant's business ethics and established public policy dictate that Defendant should only charge shipping costs that have a reasonable relationship to actual shipping costs. (FAC ¶¶ 20, 47.)

1   *Shvarts v. Budget Group, Inc.*, 81 Cal. App. 4th 1153 (2000), is distinguishable as

2   well. In *Shvarts*, the plaintiffs sued a rental car company that they had rented vehicles

3   from based on refueling charges for rental cars returned without full gas tanks. *Id.* at

4   1155. Although the plaintiffs sued under the "fraudulent" and "unfair" prongs of the

5   UCL, the trial court sustained the demurrers to such claims. On appeal, the Court of

6   Appeal, in addressing the "unfair" prong, held that such claim was barred by the

7   statutory safe harbor provided by the California Legislature in Cal. Civ. Code §

8   1936(m)(2). 81 Cal. App. 4th at 1158-59. The Court of Appeal then addressed the

9   "fraudulent" prong by concluding that the public is not likely to be deceived regarding

10  either any of the three payment options or the per gallon rate for refueling because of the

11  clear disclosures of such information on the rental agreement. *Id.* at 1160.

12       Unlike *Shvarts*, there is no statutory safe harbor created by the California

13  Legislature at issue here. *Cel-Tech*, 20 Cal. 4th at 182 ("When specific legislation

14  provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to

15  assault that harbor."). In addition, the FAC alleges the absence of any clear notice that

16  the shipping cost offered by Defendant comes at a premium. (FAC ¶ 35.) Finally, it is

17  inappropriate to apply the "fraudulent" prong analysis to the instant action alleging only

18  a violation of the "unfair" prong. Indeed, in a similar "unfair" practices case mentioned

19  above, the federal district court held that the "full disclosure" case law cited by the

20  defendant was distinguishable because the allegations satisfied the applicable test for

21  unfair practices. *Cooks*, 2016 WL 3022403, at *7.

22       **7.    Defendant's Argument that Plaintiff's Injury Was Reasonably**

23            **Avoidable Seeks to Apply the FTC Test That the Ninth Circuit**

24            **Has Expressly Rejected in the UCL "Unfair" Prong Context.**

25       Defendant argues in footnote 1 that Plaintiff's injury was an injury that could

26  have been reasonably avoided. (Mtn. Dism. at 5 n.1.) In support, Defendant expressly

27  relies upon the third prong of the FTC's section 5 test. As mentioned above, however,

28  the Ninth Circuit has expressly declined to apply the FTC standard as the definition of

- 20 -

"unfair" under the UCL.  *Lozano*, 504 F.3d at 736 ("[W]e decline to apply the FTC standard in the absence of a clear holding from the California Supreme Court.").  Given that Defendant cited *Lozano*, its omission of the Ninth Circuit's holding is inexplicable.

Moreover, as explained in *Camacho*, the third element of the FTC test is not intended to "significantly reduce the effectiveness of section 5," and should not be given an interpretation that would do so.  142 Cal. App. 4th at 1405.  For example, "consumers cannot have reasonably avoided the injury if they could not have ***reasonably anticipated the injury***."  *Id.* (emphasis added) (citing *Orkin Exterminating Co., Inc. v. F.T.C.*, 849 F.2d 1354, 1365 (11th Cir. 1988)).  There is nothing in the FAC from which to infer that Plaintiff could have reasonably anticipated the injury.  Indeed, Defendant does not even address whether Plaintiff (or the putative class) could have reasonably anticipated the economic injury pled in the FAC.  Thus, Defendant's argument is without merit.

### 8. Defendant's Argument that Plaintiff Did Not Overpay for Shipping Requires Resolving Factual Issues that Exceed the Scope of an Appropriate Motion to Dismiss Under Rule 12(b)(6).

Defendant disputes Plaintiff's allegation that he was charged a shipping fee that bore no reasonable relationship to Defendant's actual shipping costs.  (Mtn Dism. at 6:2-20; FAC ¶ 12.)  In support, Defendant relies upon Exhibit B to its RJN.[8]

This Court should not consider Exhibit B because, "As a general rule, 'a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.'"  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (citation omitted).  Even if this Court were to take judicial notice of Exhibit B because it is a matter of public record, *Lee*, 250 F.3d at 689, the specific portion cited by Defendant is irrelevant under Federal Rule of Evidence 401 and any relevancy, if any, is substantially

---

[8] Curiously, Defendant attaches as Exhibit A to its RJN the image of the Domestic Price Calculator addressed in paragraph 33 of the FAC, but attacks it as a useless tool.  (Mtn. Dism. at 6:4-11.)  Not so.  Needless to say, the mere fact that the form contains content **options** for "Contains Live Animal(s)" or "Live Animal(s) Is Day-Old Poultry" does not mean that the tool is not applicable here.

1    outweighed by unfair prejudice or confusing the issues under Fed R. Evid. 403.

2          For example, although Defendant relies exclusively upon the price list of the

3    United States Postal Service ("Postal Service") effective January 22, 2017 for parcels

4    whose weight is not over 1 pound transported via the "**<u>Retail</u>** Ground" shipping method

5    (emphasis added), which ranges between $6.65 through $8.17, which is contingent upon

6    the distance traveled, (RJN Ex. B at 6; ECF #10-4 at pg. 8 of 74), this begs the question

7    whether there is another, more appropriate price list that is applicable to the shipment of

8    Plaintiff's purchased item, which is a vacuum filter costing a mere $1.99.  (FAC ¶ 32.)

9    For example, although Defendant seems to assume that Plaintiff's shipped product, a

10   lightweight foam filter, has a weight of not over 1 pound, Defendant ignores that Exhibit

11   B contains even more inexpensive pricing for retail parcels shipped as First-Class Mail

12   with weights of 13 ounces and less.  In particular, the Postal Service currently charges

13   between $2.67 and $4.29 for shipping retail parcels as First-Class Mail.  (RJN Ex. B at

14   5; ECF #10-4 at pg. 7 of 74.)  In fact, Exhibit B indicates that the Postal Service charges

15   even lower shipping rates for large envelopes known as "Flats"[9] as First-Class Mail.  In

16   particular, the Postal Service currently charges between $0.98 and $3.50 for shipping

17   "Flats" as First-Class Mail.  (RJN Ex. B at 5; ECF #10-4 at pg. 7 of 74.)

18         Moreover, Defendant omits the fact that Exhibit B also contains "Commercial"

19   pricing that is consistently lower than "Retail" pricing.  For example, Exhibit B indicates

20   that the Postal Service charges between $5.95 and $7.20 for shipping parcels whose

21   weight is not over 1 pound for "Commercial Parcels" under its "Parcel Select-Ground"

22   service, which is contingent upon the distance traveled.  (RJN Ex. B at 23; ECF #10-4 at

23   pg. 25 of 74.)  Exhibit B also indicates that the Postal Service charges between $2.61

24   and $4.30 for shipping parcels whose weight is 13 ounces or less via its "First-Class

25   [9] Large Envelopes that qualify as "Flats" have the following size dimensions.  "Flats"
     have a length of between 11-1/2 inches and 15 inches, a height of between 6-1/8 inches
26   to 12 inches, and a thickness of between 1/4 inch and 3/4 inch.  "Pieces that are rigid,
     nonrectangular, or not uniformly thick pay parcel prices."  That is, such "rigid,
27   nonrectangular, or not uniformly thick" pieces are *not* "Flats."  (RJN Ex. B at 37; ECF
     #10-4 at pg. 39 of 74.)
28

Package Service" for Commercial Parcels.  (RJN Ex. B at 15; ECF #10-4 at pg. 17 of 74.)  Exhibit B also indicates that the Postal Service charges between $1.38 and $4.01 for shipping "Commercial Parcels" whose weight is 15.999 ounces or less via its "Parcel Select-Lightweight" service.  (RJN Ex. B at 24; ECF #10-4 at pg. 26 of 74.)

Significantly, there is nothing alleged in the Complaint identifying the **<u>weight</u>** of the filter purchased by Plaintiff, nor is there any admissible evidence submitted by Defendant addressing such topic.  In addition, there is nothing alleged in the Complaint identifying the **<u>number of zones</u>** (*i.e.*, corresponding with the geographical distance) across which the filter traveled to get to its ultimate destination in Orange County, California, which is Plaintiff's residence.  (FAC ¶ 5.)  Nor is there any admissible evidence submitted by Defendant addressing such topic.  This omission affects usage of the zone-based pricing for both "Parcel Select-Ground," (RJN Ex. B at 23; ECF #10-4 at pg. 25 of 74), and "Retail Ground," (RJN Ex. B at 6; ECF #10-4 at pg. 8 of 74).  There is also nothing alleged in the Complaint addressing the distinction between "**Retail**" pricing charged by the Postal Service and "**Commercial**" pricing and whether or not Defendant qualifies for "Commercial" pricing.  Nor is there any admissible evidence submitted by Defendant addressing such topic.  Without the foregoing information, it would be pure speculation for this Court to determine the applicable pricing to ship such item to Plaintiff via the Postal Service, or for the Court to make a factual finding as a matter of law that Defendant's $7.99 shipping charge is "reasonable" as claimed by Defendant. (Mtn. Dism. at 6:19-20.)  Such questions of fact are inappropriate to resolve via a motion to dismiss.  *Linear Technology Corp.*, 152 Cal. App. 4th at 134–35 ("Whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires 'consideration and weighing of evidence from both sides' and which usually cannot be made on demurrer."), *cited in Byler*, 2016 U.S. Dist. LEXIS 111763, at *26; *see also Delano Farms Co.*, 2010 WL 2952358, at *29 (holding that the defendant's dispute regarding whether its alleged scheme is "unfair" "is not a determination that can be made on a motion to dismiss").

1
2
3
4

**9.**   **Defendant's Implicit Argument that It Does Not Keep Records that Show the Actual Cost of Delivery Requires Resolving Factual Issues that Exceed the Scope of an Appropriate Motion to Dismiss Under Rule 12(b)(6).**

5    Defendant argues that Plaintiff's reliance upon Publication 100, Shipping and
6  Delivery Charges, dated June 2012 authored by the California Board of Equalization,
7  (RJN Ex. C), is misplaced because Defendant falls within an exception that allows it to
8  charge sales tax for delivery-related charges if it charges standard amounts for shipping
9  and does not track the cost of individual deliveries.[10]  (Mtn. Dism. at 8:26.)  Defendant's
10  argument is flawed because there is nothing in the FAC alleging that Defendant does not
11  keep records that show the actual cost of the deliveries that it makes, as required, in
12  order to invoke such exception.   Indeed, Defendant, curiously, does not even
13  affirmatively make such argument in its moving papers.  To date, Plaintiff has not had
14  any opportunity to conduct discovery regarding any topic in this case.  Such question of
15  fact is inappropriate to resolve via a motion to dismiss.  *Linear Technology Corp.*, 152
16  Cal. App. 4th at 134–35 ("Whether a practice is deceptive, fraudulent, or unfair is
17  generally a question of fact which requires 'consideration and weighing of evidence
18  from both sides' and which usually cannot be made on demurrer."), *cited in Byler*, 2016
19  U.S. Dist. LEXIS 111763, at *26; *see also Delano Farms Co.*, 2010 WL 2952358, at
20  *29 (holding that the defendant's dispute regarding whether its alleged scheme is
21  "unfair" "is not a determination that can be made on a motion to dismiss").

22    **B.**   **The CLRA Claim Should Not Be Dismissed.**

23

24  ───────────────
[10] Even if it turns out that Defendant does not track the cost of individual deliveries,
25  which is uncertain, Defendant's argument that Publication 100 "implicitly endorses"
charging a standard amount for shipping without regard to actual shipping costs
26  overstates the import of that document.  As the DMA's Ethical Guidelines state,
"Postage, shipping or handling charges, if any, should bear a **reasonable** relationship to
27  actual costs incurred."  FAC ¶ 20) (emphasis added).  There is nothing inconsistent
about the DMA's Ethical Guidelines or anything that renders compliance with
28  Publication 100 and the DMA's Ethical Guidelines mutually exclusive.

1    The FAC alleges the violation of California's Consumer Legal Remedies Act
2  ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.* under subparagraphs (9) and (14).

3    Although Defendant contends that Plaintiff's reliance on subparagraph (9) is
4  improper because "Plaintiff fails to cite any statement made by Defendant that would
5  lead a ***reasonable*** consumer to conclude the shipping charges are related to the actual
6  cost of shipment," (Mtn. Dism. at 9:7-9) (emphasis added), Defendant ignores that the
7  DMA's Ethical Guidelines, which address the industry standard business ethics in
8  charging shipping costs to consumers, "are intended to provide individuals and
9  organizations involved in direct marketing in all media with ***generally accepted***
10 principles of conduct."  (FAC ¶ 16 & Exs. 1, 2) (emphasis added).  In addition, the
11 current version of the DMA's ethical guidance on shipping charges states, "There
12 appears to be a ***trend by law enforcement agencies*** . . . to insist that a consumer who is
13 charged shipping and handling costs should be paying a fee reasonably based on the
14 marketer's cost.  Th[is] position is consistent with existing DMA guidelines."  (FAC ¶
15 26 & Ex. 5) (emphasis added).  Thus, by referencing the word "shipping" within the
16 context of a direct marketing transaction with a retail consumer, that, alone, was
17 sufficient for a reasonable consumer to infer that the shipping cost would be reasonably
18 related to the actual shipping cost.

19   Although Defendant also contends that Plaintiff's reliance on subparagraph (14) is
20 improper because this subsection "does not prohibit unethical conduct," (Mtn. Dism. at
21 9:18), Defendant offers no case authority to support its bald contention.  To the extent
22 that Defendant is claiming that no reasonable consumer would be misled by Defendant's
23 failure to disclose to consumers that its shipping costs charged to consumers are not
24 reasonably related to actual costs incurred by Defendant, that goes to the merits of the
25 claim.  "The appropriate inquiry in a motion to dismiss is not whether a plaintiff will
26 succeed on the merits of the claim."  *Byler*, 2016 U.S. Dist. LEXIS 111763, at *32
27 (denying a motion to dismiss a CLRA claim alleging the violation of subparagraph
28 (a)(5) based on similar allegations).

1    Dated:  March 24, 2017        PACIFIC TRIAL ATTORNEYS, APC

2

3                                   By: _/s/ Scott J. Ferrell_____

4                                     Scott. J. Ferrell
                                    Attorney for Plaintiff

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION TO DISMISS

**CERTIFICATE OF SERVICE**

I hereby certify that on March 24, 2017, I electronically filed the foregoing **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT ELECTROLUX HOME CARE PRODUCTS, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

*/s/ Scott J. Ferrell*
Scott J. Ferrell